Filed 7/28/26  In re B.S. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re B.S., et al., Persons Coming Under the Juvenile Court Law. | B349857 |
| _____ | (Los Angeles County Super. Ct. No. 20CCJP05745) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| J.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Eden Oxford, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant J.M. (Mother) appeals from an order of the juvenile court removing her three children from her custody. We affirm.

## BACKGROUND

Mother and C.S. (Father), not a party to this appeal, have three children together:  B.S. (now six years old, born in September 2019); M.S. (now five years old, born in May 2021); and J.S. (now three years old, born in April 2023).

Mother and Father have a history of domestic violence and intervention by respondent Los Angeles County Department of Children and Family Services (DCFS) that spans several years.

### A.    2021 Dependency Proceedings and Precipitating Events

The family first came to the attention of DCFS in May 2020, when DCFS received a referral reporting Father threw a cookie sheet at Mother while she held then one-year-old B.S., hitting her in the knee.  The referring party further reported Father had grabbed Mother by the shirt and chest, resulting in scratches to her chest.  The referral was closed as inconclusive.

In September 2020, police arrested Father for domestic violence after he placed his hand on Mother's throat and applied pressure while Mother was holding B.S.  Mother obtained a temporary restraining order against Father based on his "constantly" threatening her with a knife and having hit, punched, and choked her.  Mother reported Father's alcohol use fueled these behaviors, and that she believed he needed substance abuse treatment.  This led DCFS to file a Welfare and Institutions

Code section 300 petition,[1] alleging, inter alia, that Father had assaulted Mother and was abusing alcohol and marijuana. In February 2021, the juvenile court sustained the petition.

Reports before the court during these dependency proceedings reflect additional domestic violence incidents, some of which B.S. witnessed. For example, Mother called the police on May 13, 2020 to report Father hit her, locked her and B.S. out of the home, and scratched her, leaving a visible injury.

The court ordered Mother to participate in a domestic violence support group and individual counseling. It ordered Father to participate in a domestic violence batterers' program, individual counseling, a 12-step program, and drug testing. Mother fully participated in all services offered; Father participated in none.

In December 2021, the court terminated jurisdiction over B.S. with family law orders granting full legal and physical custody to Mother and monitored visits to Father. The court issued a restraining order protecting Mother from Father until February 2024.

### B. Instant Dependency Proceedings

#### 1. *July 2024 Detention and Precipitating Events*

Between April and July 2024, police received seven calls regarding instances of domestic violence between Mother and Father. On multiple occasions in July 2024, Father reported Mother assaulting him, including by hitting him with a hot comb, spraying him in the eyes with bleach and perfume, and biting him.

---

[1] All further statutory references are to the Welfare and Institutions Code.

On July 2, 2024, Father obtained a temporary restraining order against Mother based on allegations she beat him, slapped him, kicked him out of the residence, and threatened to change the locks. The order lapsed on July 18, 2024, and Father did not seek a new one.

In August 2024, DCFS obtained removal warrants for all three children and placed them in foster care.

### 2. *August 2024 Section 300 Petition*

On August 22, 2024, DCFS filed a section 300 petition on behalf of all three children. The court sustained the petition with interlineations and asserted jurisdiction over the children based on (1) a July 26, 2024 incident in which Father drove under the influence of alcohol with the children in the vehicle and (2) the parents' "history of engaging in violent physical altercations in the presence of the children."

The sustained petition described examples of parents' domestic violence that occurred in July 2024. On July 10, 2024, in the presence of the children, Mother struck the left side of Father's face with an open palm, and sprayed Father with pepper spray, causing the children to cough. On July 26, 2024, while in a parked vehicle with the children, Mother repeatedly struck Father's face with her cell phone, and Father repeatedly poked and struck Mother's chest, then attempted to forcibly push her out of the vehicle. On July 27, 2024, "[F]ather forced entry after . . . [M]other locked herself into the bedroom," struck Mother's right arm and face with a towel, and threw a plastic cup at her.

### 3. *October 2024 Removal*

On October 17, 2024, the court removed the children from both parents' custody with monitored weekly visits. The court

4

found both parents' progress in services had been "unsubstantial." It ordered Mother to participate in a domestic violence victims support group and individual counseling. It ordered Father to participate in a domestic violence prevention program and individual counseling, and to submit to random on-demand drug and alcohol testing. At Mother's request, the court issued a stay-away order requiring the parents to stay 100 yards away from each other and prohibiting communication of any type.

### 4. *April 2025 Return to Mother's Custody*

As of January 2025, Mother was in full compliance with her case plan, having completed a 16-week domestic violence program, four-hour online parenting class, 12-week parenting program, and individual counseling. Mother admitted to violating the 2021 restraining order, but expressed a commitment to adhering to the stay away order in effect. Father had participated in some services, including individual counseling, domestic violence classes, and parenting classes. His drug tests had mixed results, including some positive tests for marijuana and several no-shows. Father reported that he smoked marijuana for pain management following an injury.

On January 15, 2025, the court ordered unmonitored visits for Mother.

At the six-month review hearing on April 21, 2025, the court returned the children to Mother's custody. Mother and Father reported they intended to reunify, and the court granted their request that it terminate the stay away order.

The court denied Father's requests for custody or unmonitored visits, based on the levels of marijuana in his drug test results. The court prohibited Father from having his monitored visits in the family home and prohibited Mother from monitoring or

5

being present for the visits. It further prohibited Father from moving back into the family home.

### 5. *September 2025 Detention*

Police call logs reflect that, between May and August of 2025, Mother called the police several times regarding Father. On August 28, 2025, Mother requested a restraining order, alleging Father repeatedly came to the family home uninvited and would not leave until she called the police.[2] In one instance, Father broke a door to enter the home. During some of these incidents, Father appeared to be under the influence.

Soon after Mother requested the restraining order, DCFS obtained removal warrants and placed the children in foster care. At the detention hearing, the court ordered monitored visits for each parent separately, retaining the restrictions that Father was not to have visits in the family home and neither parent was to be present during the other's visits. The court issued Mother's previously requested temporary restraining order against Father, which prohibited contact and communication of any kind.

### 6. *September 2025 Petitions*

On September 4, 2025, DCFS filed a subsequent petition under section 342 and a supplemental petition under section 387. The section 342 petition alleged as additional bases for jurisdiction several instances of domestic violence in July and August 2025, Father's history of marijuana use, and Father's current alcohol abuse. (See § 342, subd. (a) [authorizing a petition "alleg[ing] new facts or circumstances . . . sufficient to state that [a person already

---

[2] It does not appear from the record that this request was granted, because Mother filed another request on September 5, 2025.

under juvenile court jurisdiction] is a person described in Section 300"].)  The section 387 petition alleged the previous disposition—placement with Mother and court-ordered restrictions on parents' contact—had not been effective in protecting the children, because the parents failed to comply with these restrictions, resulting in the July and August 2025 domestic violence incidents.  (See *In re T.W.* (2013) 214 Cal.App.4th 1154, 1161 (*T.W.*) [section 387 provides the proper vehicle to invoke when DCFS seeks to change the previously ordered placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care].)

Both petitions alleged the details of the July and August 2025 domestic violence incidents.  On July 6, 2025, Mother scratched Father's eyes, resulting in a bruise on his eye socket and burst blood vessels in his eye.  On August 19, 2025, Mother invited Father to the home while the children were there, and an argument ensued in the garage, during which Mother threw Father to the ground and shut the garage door on him, breaking his nose.  Mother locked the home, leaving Father naked outside.  He reentered the home by breaking a window.  Father appeared intoxicated during the incident.  Father returned to the home early the next morning and, "[w]hile . . . [M]other was lying down in the bedroom, . . . placed [his] body on top of" her.  She pushed him off, and "[he] struck [her] . . . face with an open palm."  Father left the home after Mother called the police.

### 7.    *October 16, 2025 Hearing*

On October 16, 2025, the court held a combined hearing on the petitions.

7

### a. *Evidence at hearing*

The court accepted several police records and DCFS reports into evidence at the hearing. These reflect the following:

On July 5, 2025, Mother told police that Father was living with Mother and the children. B.S. likewise told DCFS interviewers in August and October 2025 that Father lived with them and took B.S. to school and football practice. Mother denied Father resided in the home, stating he instead " 'stop[ped] by when [she] and the children [were not] home.' " Mother later added that, " 'Technically yes he lives here but he can't be here with this court order in place.' " Mother and Father were expecting their fourth child together in August 2026.

Mother denied the children were present for parents' domestic violence. The children, however, confirmed having witnessed physical violence between the parents. B.S. told interviewers that "daddy [had] pushed mommy out the door," and that the parents' fighting upset him and caused M.S. to cry. M.S. also reported seeing Father push Mother out the door. M.S. stated, "[Y]eah I cryin' cause daddy pushed mommy out the door, like this (Mason then pushed the air and fell to the floor)."

Mother also denied some aspects of the domestic violence incidents as outlined in the petition and police reports and maintained she was complying with all court orders. She contended Father was violating the orders; he was still contributing to the mortgage payments and felt entitled to access the home. Mother told DCFS she was sufficiently protecting the children by calling the police when necessary. When the police offered her an emergency protective order after the August 2025 incident, however, she declined.

Father denied Mother's version of the incidents, providing a different account of events. He maintained Mother was the aggressor in all domestic violence. Father stated he had no intention of following court orders, which had rendered him homeless despite his contributing to the mortgage on the family home, and that DCFS intervention was only causing problems and traumatizing the children.

Mother told DCFS she believed Father had an alcohol problem, and that this contributed to the domestic violence. She also stated Father needed, and requested DCFS provide him, substance abuse treatment. Mother reported Father smoked marijuana for the injuries he sustained from a motorcycle accident in 2017. Although Father had told DCFS in October 2024 that he "[had] an issue with 'beer' " and wanted "substance use/abuse services in the form of an outpatient program to assist with his sobriety," when DCFS interviewed him in October 2025, he denied having any issues with alcohol or substance abuse.

Mother reported she continued to participate in individual therapy, but would not permit DCFS to verify this with her therapist. She was otherwise fully compliant with her case plan.

Father was not testing consistently, tested positive for marijuana on some occasions, and was not consistent in visiting the children. He was enrolled in a domestic violence program and had completed 32 classes, was participating in counseling, and had completed a parenting program. Mother and Father also participated in 15 couples therapy sessions, from May 8, 2025 through August 18, 2025.

DCFS recommended the court remove the children from parental custody and that the juvenile court order Father to

complete a substance abuse treatment program due to his inconsistent drug testing.

### b. *Jurisdiction hearing*

The court sustained the allegations of domestic violence allegations by both Mother and Father in the section 342 petition as additional bases for jurisdiction. It dismissed the allegations regarding Father's marijuana and alcohol use.

The court resolved the conflicting statements in DCFS reports and found Mother and Father were still together, had been having contact in violation of court orders, and that the children were present for, and in some cases had witnessed, the parents' domestic violence. Based on these findings, the court sustained the allegations in the section 387 petition that the current placement was not effectively protecting the children.

### 8. *October 2025 Removal*

At the disposition phase of the October 15, 2025 hearing, the court found clear and convincing evidence established a risk of substantial harm to the children if they were to return to Mother's home "where there is constant toxicity and fighting going on, physical fighting and verbal fighting . . . [that was] putting them in harm's way consistently" and had been "for a very long time." The court emphasized that the domestic violence between parents was "not a one-time incident," and that despite the parents' compliance with their case plans, their "progress . . . toward mitigating the causes necessitating the children's placement in foster care has not been substantial." Rather, after a year of participating in services, they were "back at square one." Therefore, despite DCFS providing reasonable services to avoid removal of the children from their parents, no means short of

removal could sufficiently address the risk of harm. (See § 361, subds. (c)(1) & (e).)

The court removed the children from parental custody. It granted each parent monitored visits and prohibited visits in the family home and joint visits. Both parents' case plans included therapeutic individual counseling sessions to address the domestic violence issues and Father's substance abuse. The court did not follow DCFS's recommendation that it order a full substance abuse treatment program for Father, and instead ordered Father to submit to random drug and alcohol testing upon reasonable suspicion.

Mother requested a permanent restraining order against Father, arguing he was the aggressor in all domestic violence and came to her home uninvited. The court issued a three-year restraining order against Father, which permitted only brief and peaceful communication regarding the children's court-ordered visits. The court stated it would consider a request for a restraining order against Mother as well, should Father choose to file one.

Mother appealed.

## DISCUSSION

On appeal, Mother does not challenge the court's orders sustaining the section 342 and section 387 petitions. Rather, she challenges only the court's removal order.

After sustaining a section 387 petition, a court must consider "whether it is appropriate to change or modify the previous placement order by removing the child from her current placement." (*In re Brianna S.* (2021) 60 Cal.App.5th 303, 312; Cal. Rules of Court, rule 5.565(e)(2).) Where, as here, "the section 387 supplemental petition seeks to remove the child from her 'parent' or 'guardian,'" in assessing the need for removal, the court must

11

assess whether the evidence supports the findings necessary to justify removal under section 361, subdivision (c). (*Brianna S., supra*, at p. 312; *T.W., supra,* 214 Cal.App.4th at p. 1163, but see *In re A.O.* (2010) 185 Cal.App.4th 103, 111–112 [not so requiring].)

Pursuant to section 361, subdivision (c)(1), the juvenile court may remove a child from a custodial parent only if it finds, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) In addition, before the court orders the child removed pursuant to section 361, "[t]he court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home." (§ 361, subd. (e).)

Mother argues substantial evidence does not support any of these findings. A heightened version of substantial evidence review applies to the findings for which section 361 requires clear and convincing evidence. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) Namely, as to those—risk of harm and lack of alternative means—we "must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Ibid*.)

## A.    Risk of Harm

In considering whether DCFS has proven a risk of harm sufficient to justify removal, "the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court

12

intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332; *In re A.S.* (2011) 202 Cal.App.4th 237, 247.) "The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

Here, substantial evidence supports a finding by clear and convincing evidence that the children were at risk of suffering substantial harm from the continuing domestic violence between the parents. The record supports that the children were in the home during some of the domestic violence incidents, and that they have witnessed multiple instances of domestic violence as well. This placed them at risk of substantial harm. (See *In re Heather A.* (1996) 52 Cal.App.4th 183, 194 ["[o]bviously the children were put in a position of physical danger from this violence [perpetrated by the Father against the Mother], since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg, or by [the Mother] falling against them"]; *In re T.V.* (2013) 217 Cal.App.4th 126, 136 (*T.V.*) ["parents engaged in a pattern of domestic violence, some of which [the child] heard or saw; thus, she was at substantial risk of harm if returned home" even though she had never been injured by the violence].)

Substantial evidence also supports a finding by clear and convincing evidence that, if placed in Mother's care, this risk of harm will continue. The record reflects a pattern, spanning several years, of Mother and Father remaining in contact despite court orders forbidding it. This contact has consistently resulted in domestic violence between the parents, even during periods of DCFS supervision, and despite their participation in multiple rounds of domestic violence prevention services.

Furthermore, Mother denies that her and Father's domestic violence placed the children in harm's way. She told DCFS that she was taking sufficient steps to protect the children by calling the police when necessary. But Mother has repeatedly returned to a relationship with Father after seeking police protection from him, sometimes in violation of orders she herself requested. Mother's apparent denial as to the effect of her and Father's actions and her role therein creates a significant risk that she will not feel compelled to make the changes necessary to avoid future altercations. (See *In re V.L.* (2020) 54 Cal.App.5th 147, 156 ["[a] parent's denial of domestic violence increases the risk of it recurring"].) That Mother has already received extensive services to address these issues but has not changed her behavior further heightens that risk. (See *T.V., supra*, 217 Cal.App.4th at p. 136 [noting in affirming removal based on child witnessing domestic violence that parent had "not successfully addressed his anger issues even though he had previously participated in domestic violence treatment and therapy" and "denied responsibility for the violence, claiming [Mother] was the aggressor"].)

Mother argues substantial evidence does not support the requisite finding of harm to the children because the parents "did not appear to be particularly afraid of each other" and the domestic violence incidents "were not aimed at the children." She also notes that both parents were participating in services, consistently visiting with the children, that the visits were going well, and that the children were never physically harmed while in Mother's custody. Finally, Mother argues she has a close relationship with her children and that they want to return to her care. None of these arguments undermines our conclusion; indeed, many of them

are irrelevant in assessing risk of harm under section 361, subdivision (c)(1).

Nor do the cases Mother cites provide a basis for reversing the court's findings here.  (See *In re M.V.* (2022) 78 Cal.App.5th 944; *In re Basilio T.* (1992) 4 Cal.App.4th 155 (*Basilio T.*).)  Mother cites *M.V.* as an example of a court reversing removal based on a history of domestic violence where the parents were participating in services and visits with the children were going well.  But in *M.V.*, a social worker testified at the disposition hearing that she could not " 'think of any safety risk' " in placing the children with the Father.  (*M.V.*, *supra*, at pp. 956, 954–956.)  DCFS had based its removal recommendation solely on the view that the parents denied and minimized their domestic violence history.  (*Id.* at pp. 954–956.)  The Court of Appeal reversed on the basis that Father's denials were alone insufficient to justify removal by clear and convincing evidence.  (*Id.* at pp. 962–963.)  Here, in contrast, DCFS reported the children were at risk in Mother's care.  Moreover, the evidence supports substantial danger that does not turn on Mother's minimization of domestic violence:  Namely, evidence of Mother and Father's years-long cycle of domestic violence that the children witnessed and/or were present for, despite both parents receiving services to address these issues.

In *Basilio T., supra*, 4 Cal.App.4th 155, the Court of Appeal deemed a history of domestic violence between parents that had never physically harmed the children insufficient to support removal.  (*Id.* at pp. 160–163, 168, 171.)  But in that case, unlike here, the domestic violence had not persisted for several years.  (*Id.* at pp. 160–163.)  Nor had it persisted despite the parents' participation in services.  (*Ibid.*)  To the contrary, the court in *Basilio T.* found significant that the parents had not yet

15

participated in services to address their domestic violence issues and were not refusing to do so. (*Id.* at pp. 171–172.) Also unlike here, in *Basilio T.,* there was no basis for the court to conclude that strict DCFS supervision would be ineffective in protecting the children. (See *ibid.*)

### B. Insufficiency of Alternative Protective Measures

Mother argues that "there were other more reasonable alternatives" to removal in this case because "[f]or the most part, the parents were good citizens who had cooperated with service requirements" and thus were "doing very well in many ways." The evidence does not support that Mother's and Father's continued participation in services was a sufficient alternative means of protecting the children. To the contrary, their participation in these services has not abated their cycle of domestic violence to date. Nor has DCFS supervision or court-ordered separation deterred parents from continuing their violent altercations. Substantial evidence supports that services and supervision were insufficient to protect the children from the risk of harm in Mother's care.

Mother further argues that "order[ing] Father into a substance abuse treatment program to help alleviate the cause of the [domestic violence]" was a reasonable alternative means of protecting the children. This argument is purely speculative and based on numerous assumptions, some of which are inconsistent with the evidence. First, it assumes Father has an alcohol problem, something the court found the evidence did not establish. Second, it assumes Father—who as of the most recent DCFS report was denying he had an alcohol problem and threatening not to comply with further juvenile court orders—would participate in substance

16

abuse treatment services, if offered. Third, it assumes that addressing any issues Father has with alcohol would end a years-long cycle of domestic abuse in which *both parents* were aggressors. Moreover, it ignores the reality that substance abuse treatment does not immediately result in behavioral changes. Whether or not Father participating in a substance abuse program would eventually assist in breaking the parents' cycle of domestic violence, it would not have sufficiently protected the children at the time the court ordered it.

Substantial evidence supports the court's finding that removal was the only reasonable means of protecting the children.

## C. Reasonable Efforts To Avoid Removal

Mother argues that, because DCFS did not offer Father substance abuse services, it did not make reasonable efforts to prevent the need for removal as section 361, subdivision (e) requires. According to Mother, DCFS did not take seriously the role of alcohol in the ongoing domestic violence, particularly because Father had, at times, suggested he had an alcohol problem, and Mother had repeatedly suggested he should receive treatment for alcohol and substance abuse. Assuming Mother has not waived this argument by failing to challenge the reasonableness or sufficiency of the services offered below (see *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1110; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885), we are not persuaded. As outlined above, Mother's argument that Father receiving substance abuse treatment would have prevented the need for removal is speculative. Substantial evidence amply supports that DCFS provided reasonable services to assist the parents in addressing the domestic violence issues that were the primary focus of the dependency proceedings.

17

**DISPOSITION**

The orders are affirmed.

<u>NOT TO BE PUBLISHED</u>.

                                         ROTHSCHILD, P. J.

We concur:

            WEINGART, J.

            M. KIM, J.